IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | Cr. No. 06-045 (EGS) |
| ) | |
| SHALOME ODOKARA, ) | Sentencing Date: March 31, 2008 |
| ) | |
| Defendant. ) | |

**DEFENDANT SHALOME ODOKARA'S SECOND
SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING**

Ms. Shalome Odokara respectfully submits this Supplemental Memorandum in Aid of Sentencing. At the last sentencing hearing on March 6, 2008, the Court contemplated incarcerating Ms. Odokara at a halfway house in her community, Portland, Maine, for one year. The defense respectfully submits this supplement to provide the Court with further information concerning Ms. Odokara, her work, and the halfway house situation in Portland, Maine, which is an exceedingly poor fit with the facts and circumstances of this case. In sum, incarceration at a halfway house would destroy Ms. Odokara's nonprofit organization, Women In Need. Based on this information, and the entire record in this case, the defense respectfully urges the Court to impose a term of probation that *does not include* incarcerating Ms. Odokara at a halfway house.

**ADDITIONAL BACKGROUND**

In order to demonstrate why halfway house placement is neither necessary nor appropriate in this case, the defense is providing the Court with the following additional background information regarding Ms. Odokara and the nonprofit she operates, Women In Need.

A. **The Timeline Since Ms. Odokara Left Prison In 1991.**

   1. **January 1991- Released from Prison**

In February 1991, Ms. Odokara was released from approximately 16 months of incarceration in New York state prison. Ms. Odokara was paroled to Maryland to live with her cousin. Ms. Odokara's cousin wanted Ms. Odokara to stay, but did not want a young child (Ms. Odokara's newborn son, Michael) in the home.

As a result, just three weeks after being paroled, Ms. Odokara was homeless and on welfare. As a single mother with a young child, Ms. Odokara found herself shunned by society. The system that was set up to help women coming out of prison was essentially non-existent. Ms. Odokara tried to get a job to no avail, as no one wanted to hire a convicted felon. Ms. Odokara was advised on numerous occasions to simply give up her newborn son, Michael, and start anew, but she refused to give up her son. Ms. Odokara started to clean houses. Ms. Odokara and Michael survived that way for the next three years.

   2. **1992-1994**

In 1992, Ms. Odokara was given early release from her parole because of her perseverance and hard work.[1] She was working full time, and had begun volunteering for advocacy groups involved in women's issues.

   3. **1994-1997**

Once on her feet, Ms. Odokara went back to college and obtained her masters degree in counseling psychology. While in school, Ms. Odokara started Women In Need, as a resource to help

---

[1] The PSR incorrectly states that Ms. Odokara's parole continued until its pre-determined expiration date, which was October 1993.

women in transition to obtain information and counseling, and to find help in the social system. Women In Need was borne of Ms. Odokara's own pain from coming out of prison jobless, penniless, and with a young child, and with no network of support to turn to. Ms. Odokara has seen how women in her situation fall by the wayside and numbed their pain with illegal drugs. Ms. Odokara wanted to make a change and give back, so that others would have an easier route towards self-sufficiency than the one she had been met with.

### 4.     1997-1999

Based on her work with Women in Need, Ms. Odokara was hired as a consultant by the World Bank. She consulted on women issues in development (her first degree is in economics with a minor in accounting). Ms. Odokara also helped counsel people of color at the bank through diversity training and other programs.

### 5.     2000-2001

In September 2000, Ms. Odokara's father died after a long illness. Up until that point in time, Ms. Odokara's father was the most instrumental person in her life. Following the death of her father, Ms. Odokara fell into a deep depression. Ms. Odokara reports feeling at that time that she could have done more to help her father, perhaps by bringing him from Nigeria to the United States for treatment, or by hiring better qualified doctors to treat him. Ms. Odokara reports believing that the reason her father was so sick in the last ten years of his life was that he was disappointed in her when she went to prison. She reports feeling tremendous guilt,
believing that she was the "golden child" who had squandered her life and let down her father. The offense conduct in this case took place during this time.

### 6. 2002-2008

In 2002, Ms. Odokara moved to Maine. Why Maine? Ms. Odokara and Michael relocated to Maine because she wanted to go to a place where she was away from the community that she knew, so that there would be a fresh start for her and Michael. Ms. Odokara realized at this point that, besides her young son, the only thing she had was her passion and commitment to helping people, especially women. There was nothing and nobody in Maine for Ms. Odokara to rely upon except for this commitment.

Moving to Maine was not easy for someone in Ms. Odokara's position. Maine is a small state, 97% white and less than 1% black. Ms. Odokara reports that the first year in Maine was lonely and hard. To make ends meet, she again took jobs cleaning houses, with Michael's help. In the winter, they shoveled snow. On weekends, Ms. Odokara ran Women in Need out of her living room.

In the first year of running Women In Need in Maine, Ms. Odokara helped over 500 women. Through word of mouth, people started calling and supporting the group. Since 2002, Women In Need has assisted over 2,000 women a year.

### B. Women In Need.

Women In Need is the only non-profit in Maine run by a person of color. Since 2002, Women In Need has assisted over 2,000 women a year. Under Ms. Odokara's capable direction, Women In Need continues to serve as a resource hub, to help build community bridges, and to provide advocacy, support, and services to the community of Maine. In terms of its finances, Women In Need is entirely dependent on Ms. Odokara to raise the necessary funds from private and public sources (mostly private) in order to keep the organization alive. *See, e.g.*, Ex. 1 (Sept. 2007 *Sun Journal* article, "Funding Delays Child Development Center," noting delays on Ms. Odokara's child care center project). Ms. Odokara's advocacy on behalf of women in the state of Maine had always been in the

forefront of her undertakings, and she possesses a solid vision and philosophy of how truly successful women can be when provided with the necessary tools, resources, and opportunities. She is the backbone and face of Women in Need, both in terms of its daily operations and its fund-raising. *See, e.g., id.*

In addition to the work Women In Need performs for women on a daily basis, Ms. Odokara has also been (and continues to be) the leader of several counseling groups and planning boards. Ms. Odokara is a member of the City of Portland Planning Board, which meets at least twice a month. The meetings, which begin at 3:30pm, go well into the night, often winding down at 1am. Ms. Odokara also is the lead counselor at three different group meetings: "Everyone Desires a Safe Home," a domestic violence counseling group that meets between 6-8pm every Monday; a sexual abuse survivors group, which meets between 6-7:30 pm every Thursday; and a counseling meeting for recent inmates at Doorway to Hope, the private halfway house operated by Women In Need.

In addition to the different boards and counseling groups led by Ms. Odokara, she has also been (and continues to be) the featured speaker at a number of conferences. The following are examples of different conferences Ms. Odokara has organized and participated in in the last several years:

- In October 2004, Ms. Odokara participated in a conference called ***"Women in Public Life."*** She led the panel discussion ***"Making a Difference Across the Generations"***

- In 2005 and 2006, Ms. Odokara successfully negotiated partnerships with the Maine State Housing Authority, Bank North Mortgage Group, HUD, Fannie Mae, Northeast Bank, Bangor Savings Bank, Hancock Lumber and other Maine businesses and agencies in the presentation of home ownership expos called ***Bridges to Home Ownership.*** At these same events, Ms. Odokara led seminars called, "***Cultural Competency: Selling to Special Populations in Diverse Communities: Introduction to the Culture, Do's and***

5

*Don'ts in Diverse Real Estate Market and Key Real Estate Terms.*"

- In 2004, 2005, and 2006, Ms. Odokara was instrumental in the organization of a two-day conference, *Conference on the Issues and Affects of Domestic Violence in the Diverse Communities of the State of Maine* in collaboration with the Family Support Program at Maine Medical Center, University of New England, Family Crisis Services, Anthem the Violence Intervention Partnership, Youth Alternatives/Cumberland County Child Abuse & Neglect Council and other Maine agencies and businesses.

- Ms. Odokara has led the creation and development of the *Annual Greater Portland Maine Festival of Nations*. Now into its third year of planning, it highlights Maine's ethnic diversity, promotes ethnic traditions, encourages ethnic understanding, and promotes unity and a healthy Maine.

- Ms. Odokara is also a member of the *Task Force on Early Childhood's Humane Systems for Early Childhood Project* now chaired by Maine's First Lady Karen Baldacci. The planning grant gives Maine an exciting opportunity to foster and sustain humane, family-centered, community-rooted, culturally proficient, and strength-based systems to promote the health and safety of all young children and families.

Ms. Odokara has also started three different companies for the benefit of disadvantaged women in Maine:

- The Chickadee Child Development Company. This child day care center is to be built on land purchased by Women In Need. See www.wini.us

- Many Hands Industries. This is a company where disadvantaged women will package spices for sale. See www.wini.us

- The Acadia Trading Company. This is a company that will make products produced by

6

formerly jobless women.  *See* www.acadiaaccessories.com

**C.    The Halfway House Situation in Portland, Maine.**

There is only one halfway house in Portland, Maine that would be even arguably appropriate for Ms. Odokara.  It is called "Pharos House" (5 Grant Street, Portland, ME 04101).[2]  *See* Exs. 2 (Introduction to Pharos House) and 3 (Resident Agreement for Pharos House).  The emphasis of Pharos House (as with most halfway houses) is not further punishment of the offender, but re-entry back into society.  It accordingly seems like a very poor fit for this case, which will not involve re-entry into society from a lengthy term of imprisonment.  Pharos House describes itself as a:

> work release program *for adult offenders in the last few months of their Federal Prison sentences*.  The Program Goal is to assist residents *in the process of reintegration into the community*.  The Program provides professional case management services, residential services, and a structured re-entry program emphasizing responsibility and opportunity within a supportive environment.

Ex. 2 at 1 (emphasis added).  Under "Philosophy," the Pharos House literature states:

> We believe most offenders can benefit from a *gradual re-entry into the community*, in which supportive services have an important part. We believe an offender leaving the institution is entitled to our concern and respect and that our function as a staff is to be supportive of the efforts an offender makes towards a successful re-entry.  We believe our support can be helpful to offenders willing to make an effort on their own behalf, but that we cannot change or rehabilitate those offenders unwilling to make changes within themselves.  *Our approach rewards behaviors geared towards successful re-entry into the community.*

*Id.* (emphasis added).  Thus, the overriding goal of Pharos House is re-entry into the community – something that is simply not at issue in this case.

Examples of the stated goals of the Pharos House program are to instill "good work habits

---

[2]    The defense researched two other halfway houses in Portland:  "The Bridge," which is for those suffering from mental illness, and Crossroads (formerly "Evodia House") which is for women recovering from substance abuse disorders.

(such as going to work on time every day and working hard);" "to provide assistance in finding and maintaining jobs;" and to "assist each resident to establish and carry out an appropriate plan for continuing work, training and living in a community setting." *Id.* Respectfully, training and teaching others in these goals is precisely what Ms. Odokara does for a living, through her work at the private halfway house run by Women in Need, "A Doorway to Hope," and through her other projects. Ms. Odokara does need training or education in those things. Indeed, Ms. Odokara's placement at Pharos House would only deprive someone else more needy of these programs from having a bed space.

In terms of the rules and regulations at Pharos House, there are many that are incompatible with being the director of a significant non-profit organization. Residents must be in the house between 11pm and 6am. *See* Ex. 3 (Resident Agreement) at 2. Except for passes or furloughs, residents "may **never** be absent from the House for more than 12 consecutive hours **for any reason**." *Id.* at 5 (emphasis in original). Residents obviously may not travel any distances that would prevent them from complying with their curfew.

In terms of office resources that could be used by Ms. Odokara to operate Women In Need, there are at Pharos House "[t]hree public coin phones [that] are provided for residents' use." *Id.* at 2. Residents "may not possess a communication device (beeper, pager, or cellular phone) unless approved by the Director (or USPO for Probation cases). If approved, [residents] may use the device **only** for employment related purposes and . . . must turn the device into the front office whenever [they] are not working." *Id.* at 4 (emphasis in original). There is no parking for residents. *See* Ex. 1 at 3 ("Drawbacks are a lack of private parking space"). For residents, "[a]cess to the media"–a daily part of Ms. Odokara's work–"requires prior approval from the Pharos House Director (the Director) and the FBOP Community Corrections Manager (CCM). **Residents may not be interviewed** or photographed **without specific approval from the Director and CCM.**" Ex. 2 at 2 (emphasis added). Finally,

8

residents are required to give 25% of their gross weekly income to Pharos House so long as they live there. *Id.* at 5.

## DISCUSSION

A.  **Due to Ms. Odokara's Work As A Provider Of Social Services To Women In Need In the Maine Community, Incarceration At The Halfway House There Is Far "Greater Than Necessary" To Effectuate The Purposes Of Sentencing.**

  1.  **Incarceration At A Halfway House Would Fatally Undermine Ms. Odokara's Ability To Assist Those In Need.**

There are at least five reasons why incarceration at a halfway house would fatally undermine Ms. Odokara's incredibly important work in the community and eliminate Ms. Odokara's ability to lead Women In Need and maintain the organization as an effective champion of battered, powerless, and impoverished women. Those reasons are set forth below.

  a.  **Crisis Calls.**

First, and most alarmingly, the restrictive hours of halfway house placement would prevent Ms. Odokara from responding to late night calls from women suffering from domestic violence. Ms. Odokara's availability to respond to crisis calls from endangered women–24 hours a day, 7 days a week–is a major part of what Ms. Odokara provides for women in Maine, particularly women of color who identify first and foremost with Ms. Odokara as their port in a storm. *See, e.g.*, Ex. 4 to Defendant's Supplemental Sentencing Memorandum (Sentencing Letter from Michael Odokara ("[b]eing an executive director for a non-profit (Women In Need Industries) means waking up at one in the morning from an emergency call from one of her clients ")). For obvious reasons, this service to the community–*which undoubtedly has saved countless women from severe abuse, or worse*–would be completely lost if Ms. Odokara was incarcerated at a halfway house, where she is not even permitted a cell phone except when immediately engaged in a business call, and by prior permission.

9

      b.      **Fund-raising.**

**It is beyond dispute that incarcerating Ms. Odokara at a halfway house will crush Women In Need's ability to continue to raise money, and thereby destroy the organization.** Ms. Odokara is the backbone of Women In Need in every sense, including the financial sense. The organization is entirely dependent on her ability to raise money from public and private sources. Incarceration at a halfway house will effectively destroy the organization in two ways. First, it will destroy it in a logistical sense. Ms. Odokara will not have the necessary resources, the ability to travel, or the time in order to effectively raise money for the organization. Second, incarcerating Ms. Odokara at a halfway house will very publicly tell the Portland community that this woman is a "criminal." No matter what efforts are undertaken to educate the community that this was not a crime of theft or embezzlement, the stark reality is that Ms. Odokara's ability to raise funds for Women In Need will be irrevocably compromised. It is very easy to see why donors, particularly new donors, will hesitate in their giving. This will effectively destroy the organization.

      c.      **Non-business Hours Commitments.**

Third, serving as the backbone of Women In Need is a 24/7 job, even setting aside crisis calls from the endangered. As previously discussed, a major part of Women in Need's role in the Maine community is to provide drug and alcohol addiction counseling, and domestic violence counseling. These classes generally meet at night, after the work day is over. Her work in the classes is not consistent with the restrictive hours of halfway house placement. In addition, Ms. Odokara serves on the boards of directors for other organizations in Maine which share Women In Need's goals of eradicating domestic abuse and poverty, empowering women with job training and job placement, and helping women who are in transition. As noted, Ms. Odokara is also on the City of Portland planning board, which meets twice a month until late in the evening, sometimes until 1 am. Incarceration at

10

Pharos House, which has a strict curfew of 11pm, would obviously eliminate Ms. Odokara's ability to lead the treatment classes and serve on the various boards. It would also prevent Ms. Odokara from traveling any significant distance beyond Portland Maine, further inhibiting her ability to advance Women In Need's goals.

Thus, if Ms. Odokara is incarcerated at a halfway house, she will not be able to further Women In Need's goals by contributing to the other important programs and organizations which try to improve the lot of those in Maine. In sum, without Ms. Odokara's full efforts–many of which require significant flexibility in terms of schedule that are incompatible with halfway house restrictions–Women In Need's contributions to Maine will simply die.

### d.     Ms. Odokara Should Have The Basic Tools For Running a Significant Organization.

Ms. Odokara's job of running Women In Need requires, of course, the basic tools that any nonprofit director must have: a computer, a cellphone, a rolodex, a car. She must have the ability to reach out to donors, to service providers, and, most importantly, to the disadvantaged women in the community whom Women In Need is trying so hard to help. As set forth above (and in Exhibits 2 and 3), the rules from the halfway house prohibit Ms. Odokara from having the resources that are necessary to perform her job and the work of Women In Need. Placement at a halfway house is therefore incompatible with Ms. Odokara continuing with her work.

### e.     Ms. Odokara's Work Requires The Trust and Faith Of Those She Assists.

Finally, Ms. Odokara's success in helping women in need is largely dependent on her ability to earn the trust of those women, and to have credibility in their eyes. Incarcerating Ms. Odokara at a Pharos House would undermine her ability to do this work, as she would no longer have any credibility with the community she is trying to help. It is easy to see why women in transition–many of whom

11

already suffer from trust issues–would not trust help and assistance coming from someone in the same position that they are in, particularly given the situation for minorities in Maine, where minorities comprise only a sliver of the population.

    **2.    A Halfway House Serves No Sentencing Purpose That Would Not Be Served By Home Detention.**

In addition to the obvious drawbacks of halfway house placement in this case, it is very difficult to see any legitimate purpose that would be served by incarcerating Ms. Odokara at a halfway house. In addition to undermining her ability to help those in need in Maine, halfway house placement for Ms. Odokara would only serve to take up a bed space needed for someone else who could truly benefit from time at the halfway house to make their transition back into society.

**B.    Under The Section 3553(a) Factors, The Appropriate Sentence Is Probation.**

During the March 6th sentencing hearing, the Court indicated a belief that Ms. Odokara's offense in this case is part of a "pattern" of criminal conduct with her. Respectfully, the defense does not share this view. Ms. Odokara is a 48-year old woman who has two criminal convictions – one based on activity in 1989 and one based on activity occurring over 11 years later, in 2001. The first conviction involved a young, desperate, penniless, and pregnant women who unwisely became involved in low-level drug trafficking in order to try and build a future for herself and her unborn son. The second involved helping a friend evade a reporting requirement for bringing cash into the United States.

While the Court noted that both offenses involve bringing things into this country illegally, the similarities appear to end there. It is also not surprising that Ms. Odokara's case should have an international aspect to it; Ms. Odokara's entire family is from Nigeria, and she has traveled internationally literally hundreds of times in the past 20 years. Thus, it is not surprising that the two

times she has engaged in criminal conduct (in 1989 and 2001), the offenses have some international aspect to them.

The 3553(a) factors, as applied in this case, dictate clearly a sentence of probation. The defense respectfully urges the Court not to undermine Ms. Odokara's important work in her community by imposing halfway house or home detention conditions, particularly in light of the information set froth above.

## CONCLUSION

**WHEREFORE**, the defense respectfully submits the aforementioned background information concerning Shalome Odokara in support of its request that the Court sentence Ms. Odokara to a term of probation, without a condition of halfway house placement.

Respectfully submitted,
A.J. Kramer
Federal Public Defender


_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 208-7500, ex.134